John D. CATLETT et al., Plaintiffs,

v.

OWENS–ILLINOIS, INC., Defendant.

No. 75CV592–S.

United States District Court,
W. D. Missouri, S. D.

July 13, 1978.

Gary T. Nelms of Prewitt, Jones & Karchmer, Springfield, Mo., for plaintiffs.

Ransom A. Ellis, Jr., of Ellis & King, Springfield, Mo., Thomas L. Dalrymple, Charles R. Leech, Jr., Toledo, Ohio, for defendant.

## ORDER SETTING CASE FOR TRIAL AND RULING ON PENDING MOTIONS

COLLINSON, District Judge.

This case involves seven claims of age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq. (1970). Seven individual plaintiffs have joined their claims under the provisions of Rule 20(a), Fed.R.Civ.P.[1] The case was set for trial in April, 1977, but was continued upon application of both sides. This case will now be set for trial commencing August 7, 1978. The Court will attempt to schedule a pretrial conference prior to that date and will notify the attorneys of the exact date when a time becomes available.

The issue of plaintiff John White's capacity to join in this case has been at issue for some time. Defendant filed a motion for summary judgment on White's age claim on July 29, 1976, contending that the action was time barred under the provisions of 29 U.S.C. § 626(d). That section of the ADEA provides:

> (d) No civil action may be commenced by any individual under this section until the individual has given the Secretary not less than sixty days' notice of an intent to file such action. Such notice shall be filed—
>
> (1) within one hundred and eighty days after the alleged unlawful practice occurred, or
>
> (2) in a case to which section 633(b) of this title applies, within three hundred days after . . . receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.
>
> Upon receiving a notice of intent to sue, the Secretary shall promptly notify all persons named therein as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.

By order entered December 27, 1977, the Court directed the parties to meet and attempt to stipulate facts relevant to this motion in view of the Supreme Court's action in Dartt v. Shell Oil Co., 539 F.2d 1256 (10th Cir. 1976), aff'd by an equally divided Court, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977). The parties later informed the Court that they were unable to reach such a stipulation of facts and, on March 1, 1978, the Court, among other things, directed the parties to file narrative statements of facts which they intended to prove regarding the issues raised by defendant's motion. In that order, the Court denied defendant's motion since there were disputed facts. However the Court did not rule on plaintiff White's capacity to join in this case. On March 20, 1978, the Court set an evidentiary hearing on this question for April 13, 1978. A hearing was held on that date. Meanwhile, the parties were preparing and filing the previously ordered narrative statements and supplemental briefs. This question has now been fully briefed by both sides, the Court has heard evidence on the issue and it is now ready for a decision. There are now no disputed facts material to this issue. Upon consideration of all the evidence and arguments presented by the parties, the Court holds that the claim of plaintiff John H. White is not barred by the above quoted section of the ADEA and that he is a permissible plaintiff in this case.

White worked as a foreman at the Lily Division of Owens-Illinois at Springfield, Missouri from 1958 until his discharge on February 6, 1975. On that date, he was notified that his employment would be terminated as of February 28, 1975. He performed no work after receiving the notice and continued to draw full salary until the end of the month.[2] Mr. White testified

---

[1] Each plaintiff has also claimed a violation of the Missouri Service Letter Statute, § 290.140, RSMo (1969).

[2] February 28, 1975 is the date from which the 180-day period begins to run. Moses v. Falstaff Brewing Co., 525 F.2d 92 (8th Cir. 1975). The period ended on August 28, 1975. Sixty days from that date is October 28, 1975. This action was commenced on October 31, 1975. On that date, plaintiff White gave a formal written notice of his intent to sue to the Department of Labor.

that he considered the discharge to be permanent. (Tr. 3.).[3] Several other salaried supervisory employees, including the other six plaintiffs in this case, were given notice on that date also.

Following his discharge, White and his son set up a machine shop so that he would have a job and some income. (Tr. 4, 17, 21). A few days after the firings, he asked his wife to contact the Wage and Hour Division of the Department of Labor and to inform them that he believed he was fired because of his age. (Tr. 4, 21). Mrs. White went to the offices of the Wage and Hour Division in Springfield but Mr. Ralph Marshall, the Division's local representative, was not there. (Tr. 21). The next day, Mrs. White called Mr. Marshall and relayed to him her husband's belief that age was involved in his discharge. Marshall was very discouraging and conveyed the impression to Mrs. White that although he had heard of the discharges, there was probably nothing that could be done unless there was proof that the company was replacing the former employees with younger workers. (Tr. 22). Neither plaintiff nor his wife was aware of any filing deadlines for claims under the ADEA and Marshall did not inform Mrs. White of the 180-day rule. (Tr. 6). Mrs. White reported the substance of her conversation with Marshall to plaintiff. (Tr. 5). Plaintiff never had any personal contact with the Department of Labor within 180 days after his discharge. (Tr. 5, 10). The sole contact on his behalf was the telephone call to Mr. Marshall by Mrs. White. (Tr. 19). White did not pursue his belief that he was a victim of age discrimination because of Marshall's pessimistic evaluation of the situation. (Tr. 23).

However, in September, 1975, White learned that Lily had hired some new supervisors. This caused him to renew his interest in pursuing a claim of age discrimination. (Tr. 7–8). He attended a meeting later that month with the other plaintiffs in this case and learned for the first time that he had to give notice of his intent to sue within 180 days of the alleged unlawful act. (Tr. 7). He contacted an attorney and filed his notice on October 31, 1975, the date this suit was filed.[4]

The Department of Labor had begun an investigation of the February discharges at the Lily plant soon after they occurred. Mr. Richard Scarborough testified on defendant's behalf at the hearing on April 13, 1978. He stated that Mr. Marshall first appeared at the Lily plant on March 24, 1975 and that nobody knew that he was coming. (Tr. 28). Although no names were mentioned, Marshall announced that he was there to investigate the possibility of age discrimination in connection with the reduction in salaried employees. (Tr. 29). Marshall stated that it was against Department policy to divulge whether or not a claim had been filed with the Department by any particular individual. Scarborough knew that the visit concerned the February firings generally. (Tr. 37, 43). Marshall requested certain information regarding the firings and the reasons for the reduction. (Tr. 30–31). Scarborough reported Marshall's visit to the plant manager, Mr. Walter Campbell. (Tr. 32). The visit was also reported to the Division Personnel Department in Toledo, Ohio. (Tr. 37). Campbell was specifically informed that Marshall was investigating the possibility of age discrimination. (Tr. 33). Scarborough told Campbell that the investigation concerned the February firings generally. (Tr. 33).

Marshall returned to the Lily plant on April 1, 1975. Apparently, the requested information was not ready because Marshall left and returned to the plant on April 7, 1975. (Tr. 33). On that visit, Marshall was given the personnel folders of all terminated employees. White's folder was among those turned over. (Tr. 34, 43). He was also given access to the company's production records and employment figures of all departments affected by the February

---

**3.** All transcript references are to the hearing held on April 13, 1978.

**4.** See note 2, *supra.*

firings, including the P. B. & Cone Department where White was formerly employed as foreman. (Tr. 35). Scarborough talked with Marshall and they discussed the individuals affected by the February firings, including White. (Tr. 35, 44). Again, Marshall's investigation was reported to Campbell, the plant manager, and to the company's corporate headquarters in Toledo, Ohio. (Tr. 37).

The next visit Marshall made at Lily did not occur until August 8, 1975. By that time, four of the named plaintiffs and one other discharged employee had filed notices of intent to sue under the ADEA. At this meeting between Marshall and Scarborough, there was no discussion of reemployment or any other attempt at conciliation of the claim of any specific individual. (Tr. 38). These two met again a week later, on August 15, 1975. This meeting was in response to notices filed by two other plaintiffs in this case. The possibility of reemployment of these two was discussed at this time but no discussion was made concerning the other persons who had contacted the Wage and Hour Office. (Tr. 39). These two meetings in August, and the prior investigation of Lily, led to a series of three meetings between Marshall and the company in September.

Marshall returned to the Lily plant on September 16, 17 and 18, 1975. The entire first visit was spent reviewing the personnel folders of all employees discharged on February 6, 1975. Marshall stated that he was trying to determine if there was any reason for the Department to become further involved. (Tr. 40). White's personnel folder was among the ones examined by Marshall. (Tr. 40).

As noted previously, White sent his formal notice of intent to sue on October 31, 1975, and it was brought to Lily's attention on November 4, 1975. (Tr. 41). The point that must be emphasized in this case is that the factual circumstances surrounding the claims of these seven plaintiffs differ from the circumstances contemplated by the en-forcement structure of the ADEA. Under the provisions of 29 U.S.C. § 626, the first act of prosecution is notification of the Department of Labor of intent to sue. Thereafter, the Secretary has 60 days to investigate the claim and to attempt to remedy the situation by informal methods. The ADEA thus contemplates an individual claim of discrimination against an employer and an informal resolution of the claim with persuasive assistance from the government.

In this case, the alleged discrimination consists of multiple firings. While it is true that each plaintiff is pursuing an individual claim the complained of conduct was the inclusion of these plaintiffs in defendant's reduction of salaried employees. The governmental investigation of this reduction in personnel was conducted by the Wage and Hour Division of the Department of Labor shortly after it occurred. Lily was on notice that the investigation related to the possibility of age discrimination. Lily was on notice that the investigation related to all of the firings and not to any particular claim. Indeed, at that time, Marshall informed Scarborough that it was against department policy to reveal whether or not a claim had been filed. All of this information was communicated to the Division Personnel Department at defendant's corporate headquarters in Toledo, Ohio.

It is clear that Lily was on notice that White's firing was being investigated along with all of the others. The following passages from the transcript of the April 13, 1978 hearing are relevant on this point.

By *MR. ELLIS*:

Q  Mr. Scarborough, when Mr. Marshall came to the plant on the first visit on March 24, 1975, were specific names on specific individuals mentioned to you that he was there in connection with?

A  No, they were not.

THE COURT: But you understood that it was about all the termination of salaried employees back on February 6th?

THE WITNESS: That is correct.

\*    \*    \*    \*    \*    \*

A  I do not recall that he looked at each and every one of those [personnel folders], no. He [Marshall] was working from a list that I had furnished him of all salaried employees.

Q  Do you have any knowledge or recollection that he looked specifically at White's folder?

A  No, I do not.

THE COURT: Was White's name on the list?

THE WITNESS: His name would have been on the list.

THE COURT: His name would have been on the list. He could have looked at it if he wanted?

THE WITNESS: That's correct.

(Tr. 42–43).

\*    \*    \*    \*    \*    \*

THE COURT: Would it be fair to say, Mr. Scarborough, that you understood there [at the April 7, 1975 meeting] that Mr. White was one of the persons he [Marshall] was investigating as one of the discharged employees as to whether or not there might be a charge of age discrimination?

THE WITNESS: Yes, sir, your Honor, among—others, yes, sir.

THE COURT: Among others, all right.

\*    \*    \*    \*    \*    \*

THE COURT: Isn't it fair to say, Mr. Scarborough, from the very first you knew that he was investigating a possibility of age discrimination as to all the salaried employees that were discharged on February 6th?

THE WITNESS: That would be correct.

(Tr. 44, 45–46).

The investigations in March and April of 1975 were prior to the filing of a notice of intent to sue by any of the plaintiffs. Mrs. White called the Department of Labor in February, 1975. Marshall made three visits to the Lily plant looking into the possibility of age discrimination. Whether or not Mrs. White's telephone call prompted the investigation is immaterial. The point is that the Secretary was investigating the conduct complained of in this case and that defendant knew the purpose of the investigation, the persons involved, and the actions being questioned.

No further action was taken by the Wage and Hour Division until August, 1975. Marshall visited the Lily plant twice that month in response to notices which had been filed by six of the plaintiffs in this case. He then made three visits to the plant in September, 1975 in connection with the claims and, presumably, to attempt informal resolution of the dispute. However, even at this point in the Department's investigation, inquiry was not limited to the six persons who had filed notices. Marshall was concerned with the February discharges generally.

Q  And the next visit from Mr. Marshall occurred September 16th to 18th, 1975; is that correct?

A  That is correct.

\*    \*    \*    \*    \*    \*

Q  Were there discussions at that time about employees who had been discharged in February?

A  The majority of his time on that visit was spent in reviewing documents.

Q  Did these documents include Mr. White's personnel folder?

A  Yes, they would have, among many others.

(Tr. 40). From all the evidence in this record, it appears that there was never any serious negotiations as to conciliation of individual claims of discrimination. All employees terminated in February, 1975 were viewed by the company and the Department of Labor as a group.[5]

It is in view of these facts that the Court must determine whether the purposes of

---

5.  Apparently, Marshall requested Scarborough to reemploy plaintiffs Stewart and Myers at the August 15, 1975 meeting. (Tr. 39). This single request, though, is not the type of individual conciliation contemplated by the ADEA. It is clear from the entire chain of events that the February discharges were treated as one act of discrimination against a group of employees.

the ADEA's time limitations have been fulfilled. There are two basic policies embodied in the 180-day rule of 29 U.S.C. § 626(d). In *Moses v. Falstaff Brewing Corp.*, 525 F.2d 92, 94 (8th Cir. 1975), the court stated:

> The 180-day notice requirement is intended to serve the purposes of the Act by insuring that the Secretary of Labor is called in for conciliation purposes when disputes are fresh and by informing the employer of his employee's intentions at an early date.

In *Powell v. Southwestern Bell Telephone Co.*, 494 F.2d 485, 488 (5th Cir. 1974), the court stated:

> . . . the 180 day notice was intended to insure that potential defendants become aware of their status and the possibility of litigation reasonably soon after the alleged discrimination since the notice goes from the Secretary of Labor to the employer involved. In turn this would promote the good faith negotiation of employers during the 60 day conciliation period and provide an opportunity for preservation of evidence and records for use at a trial necessitated by failure of negotiation.

The Court had hoped that the Supreme Court would give some guidance on the proper application of these statutory provisions. However, such guidance was not forthcoming when the Court passed on *Dartt v. Shell Oil Co.*, 539 F.2d 1256 (10th Cir. 1976), *aff'd* by an equally divided Court, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977). The Tenth Circuit held that the purposes of the time limitations are:

> (1) To provide the Labor Department with an opportunity to achieve a conciliation of the complaint while the complaint is still fresh, and (2) to give early notice to the employer of a possible lawsuit, the latter promoting both the preservation of evidence and good faith negotiating on

the part of the employer during the conciliation period.

*Dartt v. Shell Oil Co., supra* at 1261.

■ The *Dartt* court held that the 180-day rule was not a strict jurisdictional prerequisite to suit but could be tolled in a proper case when the purposes of the rule had been met. The Court holds that this is a proper case for tolling the 180-day limitation because (1) both the Department of Labor and Lily were on notice shortly after the February, 1975 firings that White believed age discrimination existed, (2) White's discharge was investigated with the same vigor as were the claims of the other six plaintiffs, (3) White did not have actual knowledge of the 180-day rule and (4) Lily has suffered no legal prejudice to its defensive preparations for trial by White's formal notice of intent to sue being untimely filed.

Mrs. White's telephone call to the Wage and Hour Division in February, 1975 could be considered as being sufficient notice under 29 U.S.C. § 626(d). This sort of informal notification which does not convey a stated intent to file a lawsuit was held sufficient in *Woodford v. Kinney Shoe Corp.*, 369 F.Supp. 911, 914–915 (N.D.Ga. 1973). Defendant has argued that the Fifth Circuit "removed the underpinnings" of this holding in *Powell v. Southwestern Bell Telephone Co., supra*. However, *Woodford* is not even cited in *Powell*. Both of those cases are cited with approval by the Eighth Circuit in *Moses v. Falstaff Brewing Corp., supra*. *Woodford* is cited for the proposition that the ADEA is to be liberally construed and that a procedural question should not be interpreted to deny an employee a claim for relief unless to do so would clearly further some substantial goal of the ADEA. *Moses v. Falstaff Brewing Corp., supra* at 93–94.[6]

---

**6.** The statute requires that the notice be "filed." This seems to imply that the notice must be written. However, a writing requirement is not explicitly stated and in view of the remedial purposes of the ADEA, the Court is reluctant to make such a finding. Moreover, Title VII expressly refers to written notice, 42

U.S.C. § 2000e–5(b), and the Supreme Court has clearly held that Congress intentionally departed from the enforcement structure of Title VII when enacting the ADEA. *Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

Later cases have held that the notice must clearly convey the claimant's intent to file a civil action under the ADEA. See, e. g., Charlier v. S. C. Johnson & Son, Inc., 556 F.2d 761, 765 (5th Cir. 1977); Dartt v. Shell Oil Co., supra at 1259. Accordingly, Mrs. White's telephone call cannot be held to constitute sufficient notice. However, this telephone call did have the effect of alerting the Department of Labor that White felt that age was a factor in his discharge. When the February, 1975 firings were investigated, White's was included from the beginning until the final meeting between Marshall and Lily representatives in September, 1975. Lily was on notice that White's discharge was being looked at as well as all others affected by February reduction in salaried employees. The Court therefore holds that the purposes of the 180-day rule of 29 U.S.C. § 626(d) were met in this case and that the filing of an untimely notice of intent to sue in October, 1975 does not bar White's claim because the time limitation was tolled.

There was no real difference in the way White's claim was handled by the Secretary and Lily than the handling of the other claims. As indicated, the discharges were treated and investigated as a single alleged discriminatory act and there were no serious attempts at conciliation on an individual basis.

The notice of the existence of the ADEA required to be posted by employers subject to the ADEA, 29 C.F.R. § 850.10 (1976), did not state that a claimant must file a notice within 180 days. A copy of Lily's posted notice is appended to Scarborough's affidavit filed in connection with Lily's summary judgment motion. Although it states that a claimant should contact the Wage and Hour Division of the Department of Labor, and states that there are certain deadlines, it does not state what those deadlines are. White, through his wife, did contact the Secretary shortly after his discharge. Marshall gave such a pessimistic evaluation of the situation, though, that White did not feel that there was any reason to pursue his belief of age discrimination.[7] It was not until White learned that younger persons had been employed by Lily in the fall of 1975 that his interest in his claim was rekindled. Under these circumstances, it would not further any policy of the ADEA to bar his claim.

Finally, Lily has not suffered any prejudice by White's late filing. Lily has argued that prejudice exists because of the time and expense that has gone into defending against White's claim. This contention is without merit. Lily's basic defense in this case is that economic conditions necessitated the discharges and that factors other than age formed the basis for the decision as to who would be fired. This defense is common to all seven claims. Since Lily was on notice of the possibility of litigation resulting from the February, 1975 firings generally well within the 180-day period, it cannot claim prejudice from the fact that there turned out to be seven claims rather than six. Moreover, all documents relating to White's term of employment were retained by the company. All evidence relating to his claim has been preserved. (Tr. 41). There is simply no basis for claiming prejudice resulting from White's late notice. All that has been said makes it clear that the purpose behind the 60-day rule has also been fulfilled. That period is supposed to constitute a time for conciliation between the employee and employer with persuasive assistance from the Secretary. Evans v. Oscar Mayer & Co., 580 F.2d 298, 17 FEP Cases 221, 223 (8th Cir., Apr. 5, 1978). It also gives the Secretary a chance to investigate the claim to determine whether a suit should be filed by the government. In this case, the February firings were thoroughly investigated from March to September, 1975. The conciliation efforts by the Secretary were minimal on an individual basis. The investigation started well before any notice of intent to sue had been filed. It is clear that Marshall treated the multiple firings as a single act in his investigation.

---

7. These considerations were factors relied on in Dartt to support the holding that the 180-day period was subject to tolling. Dartt v. Shell Oil Co., supra at 1262.

Accordingly, the policy behind the 60-day rule was met by the general investigation. This put defendant on notice of the possibility of litigation shortly after the complained of conduct and, thus, the policy behind the 180-day rule was met. Since the purposes of the time limitations were fulfilled, *Dartt v. Shell Oil Co., supra,* and since it would further no policy of the ADEA to hold White's claim barred, *Moses v. Falstaff Brewing Co., supra,* the Court holds that White is a permissible plaintiff in this lawsuit.

The remaining issue that must be decided prior to trial in this case is whether the ADEA contemplates the recovery of damages based on emotional injury and mental anguish. Plaintiffs propose to prove up such damages. On March 16, 1977, defendant filed a motion *in limine* to eliminate the emotional injury claims from Count I of the claims of all seven plaintiffs. Plaintiffs filed suggestions in opposition to the motion and defendant filed a reply brief. Following the evidentiary hearing in this case on April 13, 1978, the Court conducted a pretrial conference and requested supplemental briefs on this issue. Defendant's brief was filed April 24, 1978. Plaintiffs' brief was filed June 5, 1978.[8]

■ The answer to the question of whether damages for emotional injury are recoverable under the ADEA depends, of course, on Congressional intent. The pertinent statutory provision is found in 29 U.S.C. § 626, which in part provides:

(b) The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section. Any act prohibited under section 623 of this title shall be deemed to be a prohibited act under section 215 of this title. Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid over-

time compensation for purposes of sections 216 and 217 of this article: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section. Before instituting any action under this section, the Secretary shall attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion.

(c) Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter: *Provided,* That the right of any person to bring such an action shall terminate upon the commencement of an action by the Secretary to enforce the right of such employee under this chapter.

An analysis of these statutory provisions demonstrates that damages for emotional injury are not within the ADEA and, accordingly, defendant's motion *in limine* will be granted.

Monetary damages are to be deemed "unpaid minimum wages or unpaid overtime compensation." The reference to 29 U.S.C. §§ 216 and 217, provisions of the Fair Labor Standards Act, is to incorporate the enforcement mechanisms of that Act into the ADEA. Thus, either the Secretary of Labor or an aggrieved individual may sue to enforce the ADEA provisions. However, neither the FLSA nor the ADEA specifically authorizes tort damages for emotional

---

8. Defendant has moved to strike this brief filed by plaintiffs on the grounds that it was untimely filed. The Court does not recall setting specific filing deadlines for these briefs and defendant's motion will be summarily denied.

injury and mental anguish. Both statutes do set forth a listing of permissible remedies. These include "compelling employment, reinstatement or promotion," and money damages which are deemed wages or overtime compensation.

Both statutes also provide for recovery of certain amounts as liquidated damages, although the ADEA conditions such damages on a finding of wilfulness. The amount of liquidated damages is tied to the amount of lost wages resulting from defendant's conduct. It seems clear to the Court that these monetary remedies are contractual in nature. The wages and overtime provisions and the liquidated damages provisions are tied to the employment relationship. It is this relationship that defines the amount of monetary recovery. Moreover, this relationship is contractual and the Court finds an interpretation of the statute to permit tort damages unwarranted in view of the language used by Congress in providing monetary remedies.

The ADEA and FLSA both authorize legal and equitable relief "as will effectuate the purposes" of their respective provisions. The ADEA contains a statement of purposes at 29 U.S.C. § 621(b):

> (b) It is therefore the purpose of this chapter to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

It can readily be seen that the stated Congressional purposes in enacting the ADEA focus on the employment relationship. There is no mention of recovery for personal harm resulting from discriminatory employment practices based on age. These purposes are restated without mention of tort recoveries in *Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 372 (8th Cir. 1974).

The Eighth Circuit expressed the amount of damages recoverable in a "discharge" case under the ADEA by way of dicta in *Brennan*:

Unpaid minimum wages and unpaid overtime compensation referred to in the above section [29 U.S.C. § 626(b)] and in 29 U.S.C. § 216(b) has appropriately been interpreted by the District Court in *Monroe v. Penn-Dixie Cement Corporation*, 335 F.Supp. 231, 234–235 (N.D.Ga.1971) (footnotes omitted), in a discharge case, to mean "the difference between the value of the compensation by way of salary together with other specific monetary benefits, such as increased pension benefits which would have vested prior to trial, to which the plaintiff would be entitled had he remained employed by defendant until the trial date and the value of his total benefits and earnings at other jobs from his discharge until the trial date."

*Brennan v. Ace Hardware Corp., supra* at 373.

The issue of emotional injury damages has been specifically decided by the Third and Fifth Circuits. Both courts held that such damages were not intended by Congress to be recoverable under the ADEA. Both courts recognized, as does this Court, the persuasive policy arguments that could be made in support of allowing such damages but held nevertheless that Congress did not authorize their recovery. See, *Rogers v. Exxon Research and Engineering Co.*, 550 F.2d 834, 839–842 (3d Cir. 1977), *cert. den.*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978). Citing *Rogers*, the Fifth Circuit stated:

> To be sure, the Congress was not unaware of, or insensitive to psychological and other damages incident to age-based employment discrimination.[5] It is more logical to infer from the remedial enforcement scheme contemplated by the Act legislative intent to prevent such injuries through compliance therewith, and in the event of non-compliance, prompt reinstatement, promotion or other equitable relief coupled with lost wages, and liquidated damages, if appropriate, rather than to read into the superficial phrase "Legal Relief" [footnote omitted] wrenched from context, an intent to authorize the recovery of general damages

after such injuries have been inflicted. The dominant purpose of the Act is easily discernable. It was enacted to prohibit discrimination in employment on the basis of age.[7]

The silence of the Act with respect to general damages is entirely consistent with legislative intent to abstain from introducing a volatile ingredient into the tripartite negotiations involving Secretary, employee and employer which might well be calculated to frustrate rather than to "effectuate the purposes" of the Act. [Footnote omitted.]

5./ See, e. g., 113 Cong.Rec.31254 (Nov. 6, 1967) (Remarks of Sen. Javits); 113 Cong.Rec.34745 (Dec. 4, 1967) (Remarks of Rep. Eilberg); 113 Cong.Rec. 34741 (Dec. 4, 1967) (Remarks of Rep. Steiger).

7./ Congress expressed its preference for the administrative process, avoidance of litigation and prevention of "overanxiety" on the part of American business. See 113 Cong.Rec.31254 (Nov. 6, 1967) (Remarks of Sen. Javits); 113 Cong.Rec.31253 (Nov. 6, 1967) (Remarks of Sen. Yarbrough); 113 Cong. Rec.31250 (Nov. 6, 1967) (Committee Report); 113 Cong.Rec. 34745 (Dec. 4, 1967) (Remarks of Rep. Reid and Rep. Daniels); 113 Cong.Rec.34747 (Dec. 4, 1967) (Remarks of Rep. Dent).

*Dean v. American Security Insurance Co.,* 559 F.2d 1036, 1038–1039 (5th Cir. 1977), *cert. den.,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). Although there are district court cases allowing emotional injury damages in actions under the ADEA, the great weight of authority now appears to hold such damages beyond the scope of the statute. See, Cases cited in Defendant's Supplemental Brief, pp. 5–6.

The Court believes that this interpretation accords both with the language of the statute and the purposes of the ADEA. While strong policy arguments can be made in support of a contrary holding, the Court is bound to apply the law as written by Congress. Therefore, defendant's motion *in limine* will be granted and plaintiffs will not be allowed at trial to present evidence of emotional injury resulting from defendant's alleged violation of the ADEA nor will the jury be instructed on this issue.

In view of the foregoing discussion, it is

ORDERED that plaintiff John H. White is a permissible plaintiff in this case and that his claim is not time barred; and it is

ORDERED that defendant's motion *in limine* to eliminate emotional injury claims, filed March 16, 1977, be, and the same hereby is, granted; and it is

ORDERED that defendant's motion to strike plaintiffs' response to defendant's supplemental brief in support of its motion to strike plaintiffs' claim for damages for emotional injury, filed June 14, 1978, be, and the same hereby is, denied.